# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**PUTZMEISTER AMERICA, INC.,**
          **Plaintiff-Counterclaim Defendant,**

      **v.**                       **Case No. 21-C-0356**

**POMPACTION INC.,**
          **Defendant-Counterclaim Plaintiff,**

      **v.**

**PUTZMEISTER SOLID PUMPS GMBH,**
**PUTZMEISTER CONCRETE PUMPS GMBH, and**
**PUTZMEISTER HOLDING GMBH,**
          **Additional Counterclaim Defendants.**

---

## DECISION AND ORDER

This case began when Putzmeister America, Inc., filed a complaint against Pompaction Inc. to collect nearly $1 million that Pompaction owes for products Pompaction purchased while it was Putzmeister America's distributor. Putzmeister America is incorporated in Delaware and has its principal place of business in Wisconsin, while Pompaction is incorporated, and has its principal place of business, in Canada. This court has subject-matter jurisdiction over Putzmeister America's claim pursuant to the alienage jurisdiction, 28 U.S.C. 1332(a)(2). Along with its answer, Pompaction filed a counterclaim asserting six non-federal claims. Putzmeister America is a defendant to each claim; however, Pompaction also named Putzmeister America's German affiliates as co-defendants to four of the counterclaims.

Before me now is the counterclaim-defendants' motion to dismiss five of the six counterclaims asserted by Pompaction.[1] The counterclaim-defendants raise several grounds for dismissal. First, they contend that adding the German entities would destroy diversity under the alienage jurisdiction because it would result in noncitizens being on both sides of the dispute. Second, they contend that the joint claims against Putzmeister America and the German entities do not fall within the supplemental jurisdiction, 28 U.S.C. § 1367, because those claims do not form part of the same case or controversy as the claims over which the court has original jurisdiction. Third, the German entities claim that they are not subject to personal jurisdiction in Wisconsin. Finally, the counterclaim-defendants contend that certain of the counterclaims fail to state claims upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

## I. BACKGROUND

Putzmeister America is incorporated in Delaware and has its principal place of business in Sturtevant, Wisconsin. Part of its business involves manufacturing and selling concrete pumping equipment. Putzmeister America is a subsidiary of Putzmeister Holding GmbH, a German company that has its principal place of business in Germany. According to the allegations of the counterclaim, Putzmeister Holding "has no employees of its own" and "does no business outside of overseeing and controlling its subsidiaries." (Countercl. ¶¶ 21–22.) Putzmeister America is also affiliated with Putzmeister Concrete Pumps

---

[1] Also before me is Pompaction's motion to add the German entities as parties to its counterclaims. However, this motion does not require separate discussion.

2

GmbH ("Putzmeister Germany"),[2] a German company with its principal place of business in Germany that is a subsidiary of Putzmeister Holding. Putzmeister Germany manufactures and sells a different line of pumping equipment than Putzmeister America. The pumps manufactured and sold by Putzmeister Germany are used in industrial and mining projects, while the pumps manufactured and sold by Putzmeister America are used in construction projects. I will refer to the products manufactured by Putzmeister America as "concrete pumps" and the products manufactured by Putzmeister Germany as "industrial pumps."

Pompaction Inc. is a Canadian corporation having its principal place of business in the Province of Quebec, Canada. For many years, Pompaction sold and serviced concrete pumps manufactured by Putzmeister America under a distribution agreement that assigned Pompaction an exclusive territory consisting of Quebec and the Atlantic provinces of New Brunswick, Nova Scotia, Prince Edward Island, and Newfoundland and Labrador. Over much of the same period, Pompaction sold and serviced industrial pumps manufactured by Putzmeister Germany under a distribution agreement that assigned Pompaction an exclusive territory consisting of Canada and the United States.

Although Pompaction first became a distributor of Putzmeister products in 1979, its exclusive distributorship for Putzmeister America's concrete pumps was most recently governed by a distribution agreement dated January 1, 2006. Putzmeister America

---

[2] A fourth Putzmeister entity, Putzmeister Solid Pumps GmbH, recently merged into Putzmeister Concrete Pumps. The merged entity is named as a defendant to the counterclaims. Because of the merger, any liability that was Putzmeister Solid Pumps' is now the liability of Putzmeister Concrete Pumps. Thus, I will not further discuss Putzmeister Solid Pumps in this opinion.

3

terminated that agreement effective July 17, 2019. At the time of termination, Pompaction owed Putzmeister America money for products it purchased under the distribution agreement. After termination, Putzmeister America agreed to repurchase some of the inventory Pompaction had on hand, but it demanded that Pompaction pay for the remainder. After Pompaction failed to pay the amounts owed, Putzmeister America filed the complaint in this action. The complaint alleges a single claim to recover the balance due along with a claim seeking a declaration clarifying whether the claim to recover the balance due is subject to an arbitration clause in the distribution agreement.

Pompaction filed a counterclaim along with its answer. The counterclaim consists of six counts, two of which are against Putzmeister America alone. Those two counts arise out of the distributorship for concrete pumps. In the first count (Count I), Pompaction alleges that Putzmeister America breached the distribution agreement by making direct sales of its products to customers in Pompaction's exclusive territory at various times between 2013 and the agreement's termination in 2019.

In the second count against Putzmeister America alone (Count VI), Pompaction alleges that Putzmeister America fraudulently induced it to enter into a settlement agreement relating to a dispute that arose over Putzmeister America's direct sales of equipment to a subcontractor working on a large infrastructure project outside of Pompaction's exclusive territory. Pompaction alleges that, in approximately 2014, Pompaction and Putzmeister America entered into an agreement under which Putzmeister America agreed to pay Pompaction a 10% commission on any sales it solicited in connection with the project. Pompaction believed that Putzmeister America's direct sales to the subcontractor, which occurred in 2018, violated this agreement. Later

4

in 2018 or early 2019, the parties negotiated a settlement to their dispute over the sales, during which (Pompaction alleges) Putzmeister America made two false representations that induced Pompaction to enter into the settlement. One alleged representation was that Putzmeister America would renew the concrete-pump distributorship when it expired in July 2019. The second alleged representation was that the subcontractor to whom Putzmeister America made the direct sales was not required by its subcontract with the general contractor to purchase concrete pumps from Pompaction.

The remaining four counts of Pompaction's counterclaim are brought against Putzmeister America and the German Putzmeister entities. After the counterclaim-defendants filed their motion to dismiss, Pompaction agreed to the dismissal of one of those counts (Count IV, for conspiracy to injure business) without prejudice. Thus, only three counterclaims against multiple counterclaim-defendants remain. These three claims arise out of Pompaction's industrial-pump distributorship. That distributorship was controlled by an agreement dated September 25, 2009, between Pompaction and Putzmeister Germany. On March 31, 2020, Putzmeister Germany notified Pompaction that it was terminating the distributorship effective March 31, 2021. Pompaction was surprised by this letter, and it immediately contacted Putzmeister Germany to find out why it was being terminated. An officer of Putzmeister Germany and Putzmeister Holding told Pompaction that the Putzmeister entities intended to keep using Pompaction as its distributor of industrial pumps in the United States and Canada, but that the distribution agreement would be "run through" Putzmeister America rather than Putzmeister Germany. (Countercl. ¶ 108.) This officer instructed Pompaction to work with Putzmeister America to negotiate a new distribution agreement for industrial pumps.

5

Following this conversation, Pompaction and Putzmeister America began negotiating a new distribution agreement. Pompaction alleges that, during these negotiations, "Putzmeister America promised Pompaction it would continue as a distributor of Putzmeister industrial products" and assured Pompaction "that the parties would enter into an agreement under which Pompaction would continue to distribute industrial equipment and parts . . . in Pompaction's assigned territory." (Countercl. ¶ 113.) Pompaction also alleges that these negotiations became protracted, lasting from March 2020 to March 2021. In September 2020, however, "the parties reached a general agreement on the terms of a three-year, renewable agreement for Pompaction to continue its distribution of Putzmeister industrial equipment and parts." (*Id.* ¶ 116.) In early October of that year, "the parties clarified and refined the terms and reached an agreement in principle." (*Id.* ¶ 117.) On October 3, 2020, the parties exchanged emails on one of the final contract terms (its length), and in these emails, the CEO of Putzmeister America said he was considering "how to present this to Germany" and that he was "confident [he] can get agreement [from Germany]." (*Id.* ¶ 117.) The CEO also stated that he was pleased that Pompaction would be staying on as a distributor and that Putzmeister America would immediately begin the process of formalizing a contract that contained the terms on which the parties had agreed. (*Id.* ¶¶ 117–18.)

Pompaction alleges that, in reliance on the agreement in principle and Putzmeister America's representations, it hired additional staff so that it would be prepared to provide services in connection with the Putzmeister distributorship beyond 2021. Pompaction alleges that, had it known that the distribution agreement would not be renewed, it would have downsized its operations.

6

In early February 2021, Putzmeister America sent Pompaction a draft of a written distribution agreement that encompassed the terms that the parties had previously agreed upon. (Countercl. ¶ 121.) The contract identified Putzmeister Germany as a third-party beneficiary. Pompaction was satisfied with this version of the contract, and it waited for Putzmeister America to provide it with a final copy for signature. However, after several weeks passed without Pompaction's hearing from Putzmeister America, Pompaction's president inquired about the delay. He stated that negotiations had concluded weeks earlier and that Pompaction had been "moving ahead as if the agreements were in place." (*Id.* ¶ 124.) In response, Putzmeister America told Pompaction that the parties had never reached an agreement and that Putzmeister America had since decided that it did not want to enter into a new distribution agreement with Pompaction. These communications took place in mid-March 2021, days before the existing distribution agreement was set to expire on March 31, 2021. At about the same time, Putzmeister America commenced this lawsuit against Pompaction for recovery of the amounts due under the concrete-pump distribution agreement.

After this suit was filed, Pompaction and Putzmeister America engaged in further discussions about a renewed agreement, and as part of those discussions, Putzmeister America agreed to extend the existing agreement (which was with Putzmeister Germany) until May 31, 2021. However, the parties did not reach agreement on a replacement agreement, and the counterclaim alleges that the industrial-pump distributorship was terminated effective May 31, 2021.

Pompaction alleges three counts in its counterclaim that arise out of the termination of the industrial-pump distribution agreement. The first (Count II) is for breach

7

of contract. In this count, Pompaction alleges that it and Putzmeister America entered into a binding contract for a new distribution agreement, but that Putzmeister America refuses to honor its terms. In addition to naming Putzmeister America as a defendant to this count, Pompaction names Putzmeister Germany and Putzmeister Holding. Pompaction's theory as to why the German entities are also liable for breach of contract is that Putzmeister America was acting as their "agent" when it agreed to the terms of the new agreement. (Countercl. ¶ 147.) Pompaction alleges that the agreement "resulted in a four-year distributorship agreement that granted Pompaction the right to sell Putzmeister industrial parts and equipment in an exclusive territory." (*Id*. ¶ 148.)

The second count that arises out of the industrial-pump distributorship (Count III) is for promissory estoppel. In this count, Pompaction alleges that if its discussions with Putzmeister America did not result in a binding agreement, all three Putzmeister entities would be liable for promising to renew the distributorship and causing Pompaction to reasonably rely on those promises to its detriment. Pompaction alleges that, had the Putzmeister entities not made these promises, Pompaction would not have expended additional resources on the distributorship in anticipation of its renewal; instead, it would have wound down that portion of its business and transitioned into new opportunities.

The remaining count (Count V) is entitled "quantum meruit/unjust enrichment." Pompaction brings this claim "in the alternative, in the event the Court does not find the parties reached an agreement on the terms of a replacement distributorship agreement for industrial equipment and parts." (Countercl. ¶ 165.) In this count, Pompaction alleges that it has conferred significant benefits on the Putzmeister entities by promoting its brand during its decades of work as a Putzmeister distributor. Pompaction alleges that, because

8

of its work, the Putzmeister distributorships in Pompaction's former territories are now worth more than they would have been had Pompaction not promoted the Putzmeister brand. (*Id.* ¶ 168.) Pompaction contends that allowing the Putzmeister entities to retain these benefits without compensating Pompaction for its efforts would be unjust.

The counterclaim-defendants now move to dismiss all counterclaims other than Count I, which is the claim against Putzmeister America alone for breach of the exclusivity provision of the concrete-pump distribution agreement. The counterclaim-defendants move to dismiss the three claims asserted against Putzmeister America and the German entities jointly for lack of subject-matter jurisdiction. Alternatively, the German entities move to dismiss those same claims for lack of personal jurisdiction. The counterclaim-defendants further contend that, if the court has jurisdiction over the claim for quantum meruit/unjust enrichment, that claim should be dismissed on the merits for failure to state a claim upon which relief can be granted. Finally, Putzmeister America moves to dismiss the claim for fraudulent inducement asserted against it alone for failure to state a claim. I consider these matters below.

## II. DISCUSSION

### A.      Subject-Matter Jurisdiction

#### 1.      Absence of Complete Diversity Under § 1332(a)(2)

When Putzmeister America commenced this action, it alleged that the court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2), which provides in relevant part that the court has original jurisdiction over civil actions in which the amount in controversy exceeds $75,000 and is between "citizens of a State and citizens or subjects of a foreign state." Putzmeister America seeks to recover more than $75,000 from Pompaction, it is

9

a citizen of Wisconsin and Delaware, and Pompaction is a citizen of Canada. Thus, § 1332(a)(2) supplies original jurisdiction for Putzmeister America's claim, and it also supplies original jurisdiction for any counterclaim by Pompaction against Putzmeister America alone.

However, a federal court does not have original jurisdiction over a suit in which foreign parties are on both sides of the dispute and a citizen of a State is on only one side. *See, e.g., Salton, Inc. v. Philips Domestic Appliances & Personal Care B.V.*, 391 F.3d 871, 875 (7th Cir. 2004). Thus, if Putzmeister Germany and/or Putzmeister Holding is a citizen of a foreign state, the court would not have diversity jurisdiction over Pompaction's counterclaims, which propose to join those entities as parties on the same side of the dispute as Putzmeister America, a citizen of a State. Pompaction's counterclaims allege facts establishing that both Putzmeister Germany and Putzmeister Holding are citizens of Germany. The counterclaim alleges that these entities are "corporation[s] existing under the laws of the Germany [sic]" and that they have their principal places of business in Germany. (Countercl. ¶¶ 3, 4 & 7.) Because a party's unchallenged allegations of jurisdictional facts control whether the court has jurisdiction, *see Casio, Inc. v. S.M. & R. Co., Inc.*, 755 F.2d 528, 530 (7th Cir. 1985), I must conclude that this court does not have original jurisdiction over Pompaction's counterclaims.

In its response to the motion to dismiss, Pompaction raises the possibility that, for purposes of determining citizenship under § 1332, the German entities should be treated like American limited liability companies. Each German entity is organized as Gesellschaft mit beschränkter Haftung (or "GmbH"). This term can be translated as meaning "company

with limited liability."[3] The plaintiff cites several sources indicating that a GmbH is the German equivalent of an LLC in the United States. *See* Carsten Alting*, Piercing the Corporate Veil in American and German Law - Liability of Individuals and Entities: A Comparative View,* 2 Tulsa J. Comp. & Int'l L. 187, 190 (1994)[4]; Michael Beurskens & Ulrich Noack, *The Reform of German Private Limited Company: Is the GmbH Ready for the 21st Century*, 9 German L. J. 1069 (2019).[5] According to these sources, a GmbH, like an LLC, "combines the basic structure of partnership law with the benefits of limited liability." Beurskens & Noack, *supra*, at 1070.

If the citizenship of a GmbH should be determined in the same way as the citizenship of an LLC, then the citizenships of Putzmeister Germany and Putzmeister Holding would be determined by the citizenships of their members. *See, e.g., Big Shoulders Capital LLC v. San Luis & Rio Grande R.R., Inc.*, 13 F.4th 560, 565 (7th Cir. 2021). But this would be relevant only if Pompaction were prepared to allege that *all* members of *both* German entities are citizens of the United States. For, if any member of either entity is *not* a citizen of a State, then foreign parties would remain on both sides of the dispute and treating the Putzmeister GmbHs as LLCs rather than corporations would

---

[3] *See* https://en.wikipedia.org/wiki/Gesellschaft_mit_beschr%C3%A4nkter_Haftung (last visited Feb. 16, 2022).

[4] This article is available at: https://digitalcommons.law.utulsa.edu/cgi/viewcontent.cgi?article=1166&context=tjcil#:%7E:text=With%20regard%20to%20non%2Dcorporate,company's%20assets%20or%20other%20disregard (last viewed February 16, 2022).

[5] This article is available at: https://www.cambridge.org/core/services/aop-cambridge-core/content/view/EEE3562B42294827C278567689FC84DA/S2071832200000328a.pdf/reform_of_german_private_limited_company_is_the_gmbh_ready_for_the_21st_century.pdf (last viewed February 16, 2022).

have no effect on subject-matter jurisdiction. *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 618 (7th Cir. 2010) (no citizenship under § 1332(a)(2) when party on one side is foreign and limited partnership on other side is domestic and foreign). In fact, however, Pompaction concedes that it has no information about the citizenships of the members of the GmbHs. (Br. in Opp. at 14 (stating that information about GmbHs' membership is "unavailable to Pompaction")).

Pompaction contends that, because it does not have information about the citizenships of the GmbH members, it should be allowed to take jurisdictional discovery on that topic. But I am aware of no authority providing that, when a plaintiff has no information at all about the citizenship of a defendant and thus cannot allege in good faith that the parties are diverse, the plaintiff may take discovery from the defendant to find out if diversity jurisdiction exists. Moreover, under the Federal Rules of Civil Procedure, a plaintiff must allege that federal jurisdiction exists before it may unlock the door to discovery, *see* Fed. R. Civ. P. 8(a)(1), just as a plaintiff must allege a plausible claim for relief before it may unlock the door to discovery on the merits, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). In any event, it is extremely unlikely that the GmbHs will turn out to be owned entirely by United States citizens. Notably, even if all members of the GmbHs were United States citizens, that would not be sufficient to confer jurisdiction; the citizens would also have to be domiciled in a State rather than in Germany or in another foreign state. *See Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 635–36 (7th Cir. 2021) (United States citizens domiciled abroad are not citizens of a "State" for purposes of § 1332(a)). It is virtually certain that German companies having their principal place of

12

business in Germany will not be owned entirely by U.S. citizens domiciled in the United States.

Because the possibility of uncovering facts that would support diversity jurisdiction is infinitesimal, I would not allow jurisdictional discovery even if I had discretion to do so. Further, because Pompaction does claim to be able to amend its counterclaim to allege that all members of Putzmeister Germany and Putzmeister Holding are citizens of a State, I will not decide whether, for purposes of § 1332(a), GmbHs should be treated as LLCs rather than as corporations. Instead, I will hold Pompaction to its current allegations, under which § 1332(a) does not provide jurisdictional support for Pompaction's counterclaims against all three Putzmeister entities.

### 2. Supplemental Jurisdiction

The absence of diversity jurisdiction does not end the inquiry, however, because Pompaction also contends that this court may exercise supplemental jurisdiction over the counterclaims against all three Putzmeister entities. Generally, in any civil action within the original jurisdiction of a district court, the court may exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).[6] Nether the statute nor the Constitution

---

[6] However, under 28 U.S.C. § 1367(b), when the court's original jurisdiction is based on diversity, as it is in this case, supplemental jurisdiction cannot be used to join additional parties. But that rule applies only to claims by a plaintiff, which courts have interpreted to mean only claims by the *original* plaintiff in the case. *See Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018, 1025 (7th Cir. 2006). Here, Pompaction is the defendant, and thus § 1367(b) does not apply to its counterclaims. *See* 13D *Federal Practice & Procedure (Wright & Miller)*, § 3567.2, Westlaw (database updated April 2021) ("[I]t is

defines "case or controversy," and the standard for determining whether claims arise out of the same case or controversy has been described as vague. *See Prolite Building Supply, LLC v. MW Mfrs., Inc.*, 891 F.3d 256, 258 (7th Cir. 2018). Nonetheless, courts generally ask whether the claims derive from a "common nucleus of operative facts." *Id.*

I conclude that the counterclaims to which the German entities are joined do not arise out of a common nucleus of operative facts with the claims over which the court has original jurisdiction. The claims over which the court has original jurisdiction arise out of the distribution agreement between Pompaction and Putzmeister America for the sale of concrete pumps. Putzmeister America terminated that agreement in July 2019 and now seeks to recover amounts owed by Pompaction for products it purchased while the agreement was in force. Pompaction, in turn, claims that Putzmeister America breached the agreement by making direct sales to customers within Pompaction's exclusive territory at various times between 2013 and 2019. Pompaction also brings a claim arising out of Putzmeister America's conduct with respect to the large infrastructure project outside of Pompaction's exclusive territory and the parties' settlement of the dispute over that project. The project involved the sale of concrete pumps, and the facts underlying the claim occurred between 2014 and 2019.

In contrast, the counterclaims to which Putzmeister Germany and Putzmeister Holding are joined involve Pompaction's distribution agreement with Putzmeister Germany for the sale of industrial pumps. Although the time period in which the industrial-pump distributorship was in force overlapped with the time period in which the concrete-

_____

clear that a defendant or third-party defendant does not become a 'plaintiff' for purposes of § 1367(b) by asserting a claim.").

14

pump distributorship was in force, the facts out of which Pompaction's industrial-pump counterclaims arise occurred primarily after the concrete-pump distributorship was terminated. Counts II and III are based on events that transpired after Putzmeister Germany provided Pompaction with notice that its industrial-pump distributorship would be terminated. That notice was given on March 31, 2020, nine months after termination of the concrete-pump distributorship. Between April 2020 and May 2021, the parties attempted to negotiate a replacement industrial-pump agreement, and Pompaction alleges that such negotiations resulted in either a new agreement (Count II) or an enforceable promise (Count III). No facts relating to the concrete-pump distributorship are relevant to whether the Putzmeister entities are liable for either breach of the new agreement or promissory estoppel in connection with the industrial-pump distributorship.

As for Count V, it does involve allegations pertaining to both distributorships. In this count, Pompaction alleges that it invested substantial resources in developing the Putzmeister brand over many years, and that it would be unjust to allow the Putzmeister entities to retain the value of Pompaction's efforts without paying additional compensation. Although this count relies to some extent on Pompaction's history as a concrete-pump distributor for Putzmeister, none of the facts that would be relevant to Count V are relevant to Putzmeister America's claim or to Pompaction's counterclaims against Putzmeister America alone. The facts relevant to Putzmeister America's claim are that Pompaction purchased goods during the distributorship but failed to pay for them. The facts relevant to Pompaction's counterclaims against Putzmeister America are that Putzmeister America made sales within Pompaction's exclusive territory and that it supposedly tricked Pompaction into settling the dispute that arose over the large

15

infrastructure project located outside Pompaction's exclusive territory. Facts relating to Pompaction's history of building the Putzmeister brand are not relevant to any of these claims. Likewise, the facts relating to the claims within the court's original jurisdiction are largely irrelevant to Count V.[7]

Pompaction contends that its counterclaims all arise out of a common nucleus of operative facts because they all involve "Putzmeister's course of false promises and underhanded business tactics designed to take Pompaction's customers and drive Pompaction out of business." (Br. in Opp. at 11.) But this is Pompaction's lawyers' theme of the case—something that Pompaction would argue to the court or the jury during closing arguments or another stage of the case. It is a characterization of the facts, not a common fact that Pompaction must prove to prevail on all its claims. Although this theme perhaps provides a rhetorical connection among all claims, it does not demonstrate the existence of a common nucleus of operative facts.

Finally, I note that, in its briefs, Pompaction alludes to facts that are not alleged in the counterclaim. Specifically, Pompaction cites to the declaration of its president, Francis Gagnier, in which he states that the parties intended to address Pompaction's outstanding balance to Putzmeister America for purchases made under the concrete-pump distribution agreement during negotiations for the replacement industrial-pump distribution agreement. (Decl. of Francis Gagnier ¶ 13.) Gagnier states that he believed that any repayment plan would include "at least partial forgiveness of the balance." (*Id.*)

---

[7] As discussed in Part II.C.1, below, Pompaction relies on some of the facts relating to the large infrastructure project to support its claim for unjust enrichment in Count V. Although this creates some slight overlap between Count V and Count VI, it is not enough to cause those counts to arise out of a common nucleus of operative facts.

16

Pompaction contends that these facts provide a common nucleus for Putzmeister America's claim and Counts II and III of the counterclaim because they explain why Pompaction did not pay Putzmeister America sooner. But Pompaction's motive for refusing to pay is not relevant to Putzmeister America's claim for breach of contract, since liability for breach of contract does not depend on the breaching party's motive. *See Wis. Elec. Power Co. v. Union Pacific R.R. Co.*, 557 F.3d 504, 506 (7th Cir. 2009) (applying Wisconsin law and recognizing that "liability for breach of contract is strict").

Notably, Pompaction does not claim that the replacement industrial-pump agreement that the parties allegedly formed (*i.e.*, the subject of Count II) contained a provision that forgave all or a part of the balance Pompaction owed to Putzmeister America in connection with the concrete-pump distributorship. Nor does Pompaction contend in its claim for promissory estoppel (Count III) that Pompaction reasonably relied to its detriment on a specific promise by Putzmeister America to forgive all or part of the balance due. If Pompaction had made such allegations, then the facts underlying Counts II and III would also be relevant to Putzmeister America's claim for payment of the amount owed, as they would show that Putzmeister America was not entitled to full payment. But Pompaction states only that the parties "intended" to address the balance owed in the new distribution agreement; it does not state that the parties actually addressed that balance during their negotiations and agreed to specific repayment terms. (Br. in Opp. at 12.) Because intentions alone do not provide a defense to Putzmeister America's claim

17

for breach of contract, they do not provide a basis for supplemental jurisdiction over the counterclaims.[8]

The Seventh Circuit's decision in *Rothman v. Emory University*, 123 F.3d 446 (7th Cir. 1997), is not to the contrary. In that case, the plaintiff brought a claim for disability discrimination against Emory University under federal law. Emory University then brought a counterclaim against the plaintiff to collect unpaid tuition. The counterclaim was not within the district court's original jurisdiction, but the court exercised supplemental jurisdiction over it. After the plaintiff lost his discrimination claim and Emory University prevailed on its counterclaim, the plaintiff argued on appeal that the counterclaim did not arise out of the same case or controversy as the discrimination claim and therefore was not within the district court's supplemental jurisdiction. However, the plaintiff had argued, as a defense to the counterclaim, that one of the terms of the contract between him and Emory University was that the university would not engage in disability discrimination. *Id.* at 453–54 (stating that plaintiff claimed that, by discriminating, Emory "did not perform its part of the contract"). The plaintiff further claimed that, because Emory breached its part of the contract by discriminating, he was relieved of his obligation to pay tuition. *Id.* at 454. The Seventh Circuit concluded that, because the plaintiff had claimed that the university's discrimination relieved him of his contractual obligation to pay tuition, the discrimination

---

[8] Pompaction also contends that, if it prevails on its counterclaims, it will have a set-off against Putzmeister America's main claim. While this may be true, it does not create a common nucleus of operative facts because even factually unrelated claims can give rise to a setoff. *See Zweck v. D. P. Way Corp.*, 70 Wis. 2d 426, 433 (1975) ("A set-off is a demand which the defendant has against the plaintiff, arising out of a transaction extrinsic to the plaintiff's cause of action.").

18

claim and the counterclaim for breach of contract were part of the same case or controversy. *Id.*

In contrast, in the present case, Pompaction does not allege or argue in its brief that Putzmeister America made an enforceable promise to forgive part or all of the amount Pompaction owed to it in connection with the concrete-pump distributorship. Instead, Pompaction merely notes that the parties intended to address Pompaction's indebtedness as part of their negotiation of a new industrial-pump distribution agreement. Because Pompaction does not allege in its counterclaims that those intentions were fulfilled, the counterclaims do not also serve as a defense to liability for breach of contract. Therefore, the facts relating to the industrial-pump distribution agreement are not relevant to Putzmeister America's collection claim.

### 3. Conclusion Regarding Subject-Matter Jurisdiction

For the above reasons, I conclude that the counterclaims involving joinder of the German entities (Counts II, III, and V) are not within the court's original jurisdiction or its supplemental jurisdiction. Those counterclaims will be dismissed without prejudice. However, if Pompaction amends its counterclaims to drop the foreign entities and assert them against Putzmeister America only, then the claims will be within the court's original jurisdiction under 28 U.S.C. § 1332(a)(2), as foreign parties will be on only one side of the dispute. As discussed in Part II.C.1, below, Count V fails on the merits, and therefore granting Pompaction leave to amend to assert that count against Putzmeister America only would be futile. However, Putzmeister America has not moved to dismiss Counts II or III on the merits, and therefore I will grant Pompaction leave to amend those claims to assert them against Putzmeister America only.

19

**B.     Personal Jurisdiction**

Because I have dismissed the counterclaims against Putzmeister Germany and Putzmeister Holding for lack of subject-matter jurisdiction, I cannot address their claim for dismissal based on lack of personal jurisdiction. *See Page*, 2 F.4th at 639 (holding that once court determines it lacks subject-matter jurisdiction, it may not reach the question of personal jurisdiction).

**C.     Motion to Dismiss for Failure to State a Claim**

As noted above, I have jurisdiction over the counterclaims against Putzmeister America alone (Count I and VI) under 28 U.S.C. § 1332(a). I thus may consider Putzmeister America's motion to dismiss Count VI for failure to state a claim upon which relief can be granted. Moreover, I will have subject-matter jurisdiction over Counts II, III, and V if Pompaction amends its counterclaim to drop the German entities as parties. I thus may consider Putzmeister America's motion to dismiss Count V for failure to state a claim upon which relief can be granted in the context of determining whether granting leave to amend would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

To avoid dismissal under Rule 12(b)(6), a pleading must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The pleading must, at a minimum, "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In construing Pompaction's counterclaim, I assume that all factual allegations are true but disregard statements that are conclusory. *Iqbal*, 556 U.S. at 678.

20

Because the parties do not raise an issue concerning choice of the substantive law to apply to the counterclaims, I apply Wisconsin law. *See, e.g., Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.").

### 1. Quantum Meruit/Unjust Enrichment

Count V is entitled "quantum meruit/unjust enrichment." Initially, I note that this title is ambiguous, in that it refers to two distinct claims having different elements of proof and measures of damages. *See Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 476 (7th Cir. 2009) (applying Wisconsin law). In its brief, Pompaction cites the elements of a claim for unjust enrichment (Br. at 24), and thus I assume that that is the claim it intends to pursue. Nevertheless, both unjust enrichment and quantum meruit are quasi-contractual theories of relief that do not apply when the parties' relationship is governed by an enforceable contract. *Carroll v. Stryker Corp.*, 658 F.3d 675, 682 (7th Cir. 2011) (applying Wisconsin law); *Lindquist Ford*, 557 F.3d at 476.

Here, Pompaction's claim must be dismissed because the parties' relationships were controlled by express contracts. Pompaction alleges that it promoted the Putzmeister brand over many years in the United States and Canada (Countercl. ¶ 166), which conferred a benefit on the Putzmeister entities in the form of increasing the value of the exclusive-distribution rights to Pompaction's former territories, which Putzmeister appropriated by assigning the territories to other dealers (*id.* ¶ 168). These allegations necessarily involve matters governed by the written distribution agreements for

21

Pompaction's former territories. (Countercl. ¶¶ 26–32.) Therefore, as pleaded, the unjust enrichment claim must be dismissed.

In its brief, Pompaction asserts that it "sold some products and equipment outside of its contractual territories." (Br. at 24.) In support of this assertion, it cites paragraphs 53 and 61–75 of its counterclaim. Paragraph 53 alleges that "by mutual agreement and course of dealing, Pompaction was permitted to sell in the eastern portion of Ontario province, where there was no assigned dealer and where Putzmeister had little to no presence." Again, however, Pompaction alleges that these sales were made pursuant to a "mutual agreement" with Putzmeister, so quasi-contractual theories are unavailable. Further, because Pompaction presumably made a profit on its sales to customers in Ontario, it is difficult to see how such sales could give rise to a claim for compensation under theories of unjust enrichment or quantum meruit. In any event, Pompaction has not pleaded facts establishing a plausible claim for unjust enrichment or quantum meruit based on the Ontario sales alone.

Paragraph 61–75 of Pompaction's counterclaim concern the sales Pompaction solicited in connection with the large infrastructure project. But here again, Pompaction alleges that its solicitation efforts were undertaken pursuant to a contract, namely, the "agreement [with Putzmeister America] under which Pompaction was to receive ten percent of gross sales related to the [infrastructure] project as compensation for [its] efforts in securing the business." (Countercl. ¶ 62.) Although Pompaction brings a claim for fraudulent inducement that is related to this agreement, Pompaction does not allege that the commission agreement itself is unenforceable due to fraudulent inducement; instead, it alleges that a separate agreement to settle a claim for breach of the

22

commission agreement was procured by fraudulent inducement. So, even if Pompaction were to prevail on the fraudulent inducement claim, the commission agreement would remain enforceable. Thus, Pompaction cannot bring a claim based on quasi-contractual theories in connection with the large infrastructure project.

In sum, because Count V does not state a claim against Putzmeister America, I will not grant Pompaction leave to amend that count and drop the German entities as parties. I also note that, at this point, I see no way in which Count V against Putzmeister America alone could be salvaged by further amendments. However, I do not mean to preclude Pompaction from seeking leave to amend if it believes in good faith that additional allegations could establish a claim for unjust enrichment or quantum meruit in connection with matters not within the scope of any enforceable contract. But at this point, because it appears that further amendments would be futile, I will not invite such amendments. If Pompaction wishes to amend Count V, it must file a motion for leave to amend in which it explains how the amendments result in a viable claim.

### 2.     Fraudulent Inducement

The remaining claim involves the large infrastructure project. As noted, Pompaction alleges that, under a contract with Putzmeister America, it was entitled to receive a commission of 10% on sales it solicited in connection with the project. (Countercl. ¶ 62.) According to Pompaction, Putzmeister America breached this contract by making direct sales of concrete pumping equipment to a subcontractor for the project, which prevented Pompaction from earning a commission of several hundred thousand dollars.

23

In late 2018, Pompaction and Putzmeister America engaged in discussions to try to resolve the dispute over the direct sales to the subcontractor. During those discussions, Pompaction told Putzmeister America that it believed that the general contractor for the project had instructed the subcontractor "to buy Putzmeister equipment from Pompaction." (Countercl. ¶ 72.) Putzmeister America denied that this was true and instead represented to Pompaction that the subcontractor "was authorized to make its own decision about the equipment to purchase for the project." (*Id.*) During the discussions, "Putzmeister America also assured Pompaction that it would keep Pompaction as a dealer with Putzmeister America" under the concrete-pump distribution agreement. (*Id.* ¶ 73.)

Following these discussions, Pompaction and Putzmeister America "reached a settlement pursuant to which Pompaction agreed to a large discount on its claims, based in large part on Putzmeister America's representations, and executed a release in December 2018." (Countercl. ¶ 74.) Pompaction alleges that it later learned that the general contractor had required the subcontractor to "purchase Putzmeister pumps" and had provided the subcontractor with a bid Pompaction had submitted to become a supplier of concrete pumps for the project. (*Id.* ¶ 75.) Pompaction alleged that this information established that Putzmeister America's prior representation that the subcontractor "was authorized to decide which products to use" was false. (*Id.*) Further, Pompaction alleges that, because Putzmeister America terminated Pompaction as its concrete-pump distributor in July 2019, Putzmeister America's representation in December 2018 that it would not terminate the distributorship was false. (*Id.* ¶ 73.)

24

Pompaction alleges that Putzmeister America's two false statements fraudulently induced it to enter into the agreement that resolved the dispute over the infrastructure project. Under Wisconsin law, the elements of fraudulent inducement are: "a statement of fact that is untrue, made with the intent to defraud, and for the purpose of inducing the other party to act on it, which the other party relies on to his or her detriment, where the reliance is reasonable." *Kailin v. Armstrong*, 252 Wis. 2d 676, 702 (Ct. App. 2002).

Putzmeister America raises two grounds for dismissing this claim. First, it contends that Pompaction has failed to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b). To satisfy this rule, a pleader must "describe the 'who, what, when, where, and how' of the fraud." *United States ex rel. Mamalakis v. Anesthetix Mgmt. LLC*, 20 F.4th 295, 301 (7th Cir. 2021) (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016)). Here, Pompaction has failed to comply with this requirement. Although I will assume that Pompaction has adequately described the "what" (the broad subject matter) and the "when" (during settlement negotiations in December 2018) of the fraud, the remaining elements are missing. Most significantly, Pompaction does not identify the "who" of the fraud because it does not identify the representatives of Putzmeister America who made the allegedly false representations. Similarly, Pompaction does not identify the "where" or "how" of the fraud because it does not describe whether the representations were oral or written or whether they occurred at a specific location or through electronic correspondence. Thus, for this reason alone, Count VI must be dismissed. However, because it might be possible for Pompaction to cure these deficiencies through amendment, I will also address Putzmeister America's other argument for dismissal.

25

Its other argument is that Pompaction has not alleged facts showing that Putzmeister America knew that its statements were false at the time it made them. Again, I agree. First, with respect to the representation about not terminating the distributorship, Pompaction does not allege that Putzmeister America knew it would terminate the distributorship at the time it made the representation in December 2018. Instead, Pompaction alleges only that Putzmeister America broke its promise "six months later, in July 2019." (Countercl. ¶ 73.) But unfulfilled promises or statements of future events cannot serve as a basis for a fraud claim. *Hartwig v. Bitter*, 29 Wis. 2d 653, 656 (1966). Pompaction likewise does not allege that Putzmeister America knew that its statement about the subcontractor's freedom to purchase from any supplier was false. Although Pompaction alleges that it eventually "learned" that these representations were false (Countercl. ¶ 75), it does not allege that Putzmeister America knew that the representations were false at the time it made them. Thus, Count VI must be dismissed for this reason also.

It may be possible for Pompaction to cure these pleading deficiencies. Therefore, I will grant Pompaction leave to amend Count VI of its counterclaim. *See Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss.").

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the counterclaim-defendants' partial motion to dismiss the counterclaim is **GRANTED IN PART**. The motion is granted to the

extent that Counts II–V of the counterclaim are dismissed without prejudice for lack of subject-matter jurisdiction and Count VI is dismissed under Federal Rule of Civil Procedure 12(b)(6). Pompaction is granted leave to amend Counts II and III by dropping Putzmeister Germany and Putzmeister Holding as parties and asserting the counts against Putzmeister America alone. Pompaction is also granted leave to amend Count VI to cure the pleading deficiencies that resulted in its dismissal. The amended counterclaim must be filed on or before **March 11, 2022**.

**IT IS FURTHER ORDERED** that Pompaction's motion to add parties to its counterclaims is **DENIED**.

Dated at Milwaukee, Wisconsin, this 16th day of February, 2022.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge

27