UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

PUTZMEISTER AMERICA, INC.,

        Plaintiff,

    v.                                 Case No. 21-CV-356

POMPACTION INC.,

        Defendant.

## DEFENDANT'S FIRST AMENDED COUNTERCLAIM

The defendant and counterclaimant, Pompaction Inc., by its attorneys, O'Neil, Cannon, Hollman, DeJong & Laing S.C., hereby asserts the following counterclaim against the plaintiff, Putzmeister America, Inc.:

### PARTIES

1.      Pompaction Inc. ("**Pompaction**") is a corporation organized and existing under the laws of the Province of Quebec, Canada and has its principal place of business at 119 Hymus Blvd., Pointe-Claire, Quebec H9R 1E5 Canada.

2.      Pompaction is engaged in the business of selling and servicing concrete pumps, industrial pumping equipment, and similar equipment, as well as parts for those products, in the United States and Canada.

3.      Putzmeister America, Inc. (formerly known as Putzmeister, Inc.) ("**Putzmeister America**") is, upon information and belief, a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 1733 90th Street, Sturtevant, Wisconsin 53177.

4.      Putzmeister America is engaged in the manufacture, assembly, and sale of material handling equipment including truck-mounted, trailer-mounted, and stationary concrete pumps; truck-mounted telescoping conveyors; and similar equipment and parts for that equipment, which is manufactured and sold in Sturtevant, Wisconsin.

5.      Putzmeister America is related to German companies that presently or formerly manufacture different products under the Putzmeister name: Putzmeister Concrete Pumps, GmbH ("**PCP**") and Putzmeister Solid Pumps, GmbH ("**PSP**"). Upon information and belief, in approximately January 2020, PSP merged into PCP, and PCP assumed PSP's rights and obligations. Throughout this pleading, the phrase "**Putzmeister Germany**" refers to PSP (if regarding to conduct before the merger) and PCP (if referring to conduct after the merger).

6.      Upon information and belief, Putzmeister America and Putzmeister Germany are both wholly owned subsidiaries of Putzmeister Holding, GmbH ("**Putzmeister Holding,**" and collectively with PSP, PCP, and Putzmeister America, "**Putzmeister**").

## BACKGROUND

### A.  The Parties' Relationships

7.      Pompaction is a family-owned Canadian business, with operations in America, that focuses on selling and servicing large concrete mixers, pumps, conveyors, and related equipment.

8.      Pompaction has been in business for over 40 years, and currently has over 70 employees.

9.      Pompaction has been a distributor of Putzmeister products since 1979.

2

10.     Due to the structure of Putzmeister's business entities and name changes over time, Pompaction has contracted with multiple Putzmeister entities at various times, each within the Putzmeister family of companies.

11.     When Pompaction first became a distributor of Putzmeister products, its agreement was with an entity called Thomsen-Putzmeister. On information and belief, Thomsen-Putzmeister is a predecessor of Putzmeister America.

12.     One of the most recent contracts between Pompaction and Putzmeister was the Exclusive Distribution Agreement dated January 1, 2006 (the "PMA Agreement"), between Pompaction and Putzmeister America, which was terminated by Putzmeister America in 2019.

13.     Under the PMA Agreement, Pompaction was designated as the "independent distributor of Products within the Territory." "Products" is defined under the PMA Agreement to include certain large pieces of machinery, including Thom-Katts (trailer-mounted concrete pumps), Mortar Machines (machines used for applying mortar and other products), Concrete Pumps, and Telebelts (a truck mounted conveyor for concrete). Each of these are large pieces of machinery which are manufactured by Putzmeister and are sold by Pompaction for hundreds of thousands or millions of dollars.

14.     The PMA Agreement also included "repair and replacement parts" in the definition of the Products that Pompaction was authorized to distribute.

15.     The PMA Agreement further provides Pompaction with the right to service these Products for customers within the territory.

16.     Pompaction had exclusive rights to its territory under the PMA Agreement, meaning "it shall be the only distributor of the Products appointed by Putzmeister for the Territory."

17.     Pompaction also has a Distribution Contract with Putzmeister Germany dated September 25, 2009 (the "PIT Agreement") under which Pompaction has an exclusive right to distribute a line of Putzmeister equipment used in industrial settings, as well as spare parts for that equipment, within the defined exclusive territory covering Canada and the United States.

18.     The preamble to the PIT Agreement, which the Putzmeister founder believed to be essential to the agreement and insisted be contained in the agreement, contains the following guiding principles for the parties' relationship:

> **PREAMBLE**
> The parties commit to comply with the customs of prudent business merchants.
> For the collaboration stipulated in this contract the parties assure to act in compliance with the confidence-building Four-Question-Probe. This applies especially for the solution of initially unknown aspects and for subsequent occurring problems and chances.
> - Is it the truth? Am I honest?
>
> - Is it fair to all concerned?
>
> - Will it build goodwill and better friendship?
>
> - Will it be beneficial to all concerned?

19.     The Putzmeister companies also held themselves out in their marketing materials as fair, stating they "treat [their] partners with absolute respect and conduct [their] business with integrity, fairness and trust at all times."

20.     The PIT Agreement and the PMA Agreement were two of the latest iterations in a long line of agreements between Putzmeister companies and Pompaction under which Pompaction had developed the customer base for Putzmeister and sold Putzmeister products.

**B.  Background on the Pumping Marketplace**

21.     Many of the customers in the market for concrete pumps like the kinds manufactured or assembled by Putzmeister America are concrete pumping services, sometimes

4

called pumpers, who work on construction sites or projects. These pumpers are direct competitors, know each other well, and communicate with each other frequently.

22.     Many pumpers favor one make of equipment over another, for maintenance or other purposes.

23.     Within Quebec and the Atlantic provinces in Canada, there are approximately 6-8 major pumpers and over 75 smaller pumpers.

24.     The pumping products Putzmeister Germany manufactures are typically used on industrial projects or at mines.

25.     Because much of the equipment Putzmeister manufactures is large and expensive, and equipment is often built to order, customer orders are often placed months in advance of the expected delivery date.

26.     In addition to supplying pumps and large equipment, a large part of the pump industry, and Pompaction's work in the industry, involves servicing equipment and charging for the labor and parts (or providing the parts and labor under warranty, which is then paid for by the manufacturer). In this way it is comparable to the more familiar automobile industry, with car dealers who also perform service.

27.     As a Putzmeister distributor, Pompaction has consistently sold pumps and related equipment, as well as performed service and sold spare parts, for decades.

28.     The labor for servicing equipment and machines and the sale of parts are a highly profitable part of Pompaction's business and allows Pompaction to employ many skilled service technicians.

## C. Pompaction Spent Years Developing the Canadian and American Markets for Putzmeister Products.

29.     At the time that Pompaction first began selling Putzmeister products, Putzmeister did limited business in Canada and the United States.

30.     Through years of marketing and promoting the Putzmeister brand in the Canadian and American markets, Pompaction has significantly expanded Putzmeister's sales in its Putzmeister territories—both within its smaller territory for concrete pumps and throughout Canada and the United States, where it has sold industrial Putzmeister products.

31.     These marketing efforts include maintaining market presence and strong contacts in the industry, sending representatives to projects and job sites, consistently promoting the Putzmeister brand and product lines, and keeping well-attuned to the needs of the industry and business opportunities.

32.     These efforts are undertaken by Pompaction at Pompaction's own expense.

33.     Through Pompaction's marketing and business efforts, Putzmeister's sales in the various territories handled by Pompaction increased over the years to sales of approximately $22 million to $27 million each year, with market fluctuations.

34.     As a result of Pompaction's efforts and promotion of its brand, Putzmeister's market share also grew substantially from near zero when Pompaction started distributing Putzmeister products. Pompaction was key to convincing many customers, including major pumpers with substantial business, to switch to Putzmeister products.

35.     Pompaction's efforts have resulted in Putzmeister products having approximately 50-60% of market share in Quebec for large concrete pumps and conveyors and similarly increased market share for other Putzmeister product lines.

6

36.     Pompaction has won numerous awards from both Putzmeister America and Putzmeister Germany for its excellence as a Putzmeister distributor, including: President Award for Large Line Sales from Putzmeister America in 2009; North American Large Line Distributor of the Year from Putzmeister America in 2012; Large Line Domestic Distributor of the Year from Putzmeister America in 2013; Certificate for Best Service Sales Partner and Superior Customer Support from PSP in 2014; International Spare Parts and Pipe System Dealer of the Year from Putzmeister America in both 2014 and 2015; and Domestic Spare Parts and Pipe System Distributor of the Year from Putzmeister America in 2017.

**D. Putzmeister America's Repeated Sales into Pompaction's Exclusive Territory**

37.     Under the PMA Agreement, Pompaction had an exclusive right to sell Putzmeister products manufactured or sold by Putzmeister America to customers within Pompaction's territory in Canada, which included all of Quebec and several Atlantic provinces.

38.     In addition, by mutual agreement and course of dealing, Pompaction was permitted to sell in the eastern portion of Ontario province, where there was no assigned dealer and where Putzmeister had little to no presence.

39.     Putzmeister America's first known encroachment on Pompaction's territory was in approximately 2013. It involved one of the biggest pumpers in Quebec ("Customer A"), which had been a long-standing customer of Pompaction.

40.     In 2012, Pompaction gave Customer A a quote for some Putzmeister equipment. Without telling Pompaction, in approximately 2013, Putzmeister America also quoted the same equipment (at a lower price) to Customer A, took the business, and delivered the machine to Customer A.

7

41.    Pompaction later found out and asked Putzmeister America for an explanation. Putzmeister America represented to Pompaction that Customer A (no doubt preferring the lower price made possible by cutting out the dealer) wished to continue to purchase direct from Putzmeister America. Putzmeister America pressured Pompaction to agree to turn Customer A into a "house account" at Putzmeister America, to allow Pompaction's long-standing customer to buy equipment and parts directly from Putzmeister America. Putzmeister America offered to pay Pompaction a set amount on sales of machines to Customer A going forward (in an amount less than the profit Pompaction would have made on equipment sales), but not on sales of parts. Putzmeister America did not provide compensation for the lost revenue from servicing the equipment and did not pay any amount on the first encroaching sale.

42.    In approximately 2013 or 2014, Putzmeister America also began selling equipment and parts to another one of Pompaction's customers ("Customer B"), a company based in a city along the border of Quebec. This conduct continued for several years. Though Putzmeister America paid a set amount on the sales of equipment to Customer B (in an amount less than the profit Pompaction would have made on equipment sales), it did not pay any amount on sales of parts, and Putzmeister America did not provide compensation for the lost revenue from servicing the equipment.

43.    At a meeting in February 2017 with the then-CCO of Putzmeister Germany or Putzmeister Holding and a senior vice president of Putzmeister America, Pompaction raised this issue and the harm to Pompaction's business that these encroachments were causing and would continue to cause, and the Putzmeister representatives at the meeting agreed to take steps to correct it.

44. At a meeting attended by several representatives of the various Putzmeister entities (including the then-CCO of Putzmeister Germany or Putzmeister Holding) and representatives of Pompaction that took place in Wisconsin in September 2017, the representatives of Putzmeister present at the meeting again agreed to take steps to correct the issue. At that meeting, Pompaction explained the harm, both actual and potential, that was caused when Putzmeister made direct sales in Pompaction's territory, especially without Pompaction's knowledge.

45. Putzmeister never followed through on the agreed actions that resulted from the 2017 meetings.

**E. Putzmeister America's Pattern of Bad Faith and Unfair Competition Continues.**

46. Putzmeister America also used its house account sales to damage Pompaction and harm its business reputation.

47. When Putzmeister first began manufacturing the BSF 63 (the "63m"), the largest truck-mounted concrete pump it had made to date, it could not legally be operated in Quebec. The 63m pumps sold for over $1 million each.

48. The 63m is large with a very long boom reach, and thus was sought after by many pumpers, but the machine's large size made it very heavy.

49. In 2017, the laws and regulations in place in Quebec changed, such that the 63m was not entirely illegal, but anyone wishing to use a 63m in the province needed to obtain special approval by the Ministère des Transports ("MdT") for it to be legally operated, and the machine had to be modified (for example, by modifying the number of axles) to obtain that approval.

50. Pompaction had customers who wished to purchase 63m pumps, including one large customer ("Customer E") who placed an order in 2018 for three 63m pumps, conditioned

on approval with MdT, and indicated it was willing to purchase them as soon as they could be legally operated.

51.     Customer E is a major pumper that competes with Customer A (the first "house account" Putzmeister America took from Pompaction), and was eager to be the first pumper in Quebec to have the 63m pumps for competitive reasons.

52.     Based on this order, Pompaction then began working with MdT, an outside consultant, and engineers at Putzmeister America to identify the feasible and necessary modifications to make the 63m pump legal to operate in Quebec. Pompaction obtained approval from MdT in 2019.

53.     Unbeknownst to Pompaction, Putzmeister America promised Customer A it would give Customer A the first 63m machines after the necessary approvals from MdT were received and the modifications were made to the pumps. Upon information and belief, Customer A placed its order *after* Customer E, but Putzmeister America gave preference to Customer A, the "house account" customer it had taken from Pompaction a few years prior, to give Customer A the competitive advantage over Pompaction's customer.

54.     As a result, Customer E questioned why it had to purchase Putzmeister equipment from Pompaction when its competitor, Customer A, did not. Indeed, Customer E threatened to sue Pompaction and Putzmeister America. This resulted in damage to Pompaction's reputation and business and jeopardized its market position.

55.     In approximately 2018 or 2019, Pompaction learned that Putzmeister America yet again invaded Pompaction's exclusive distribution territory and sold machines directly to yet another pumper ("Customer F") located in Pompaction's territory.

56.     Pompaction does not know, and has no way of knowing, how many other customers in its territory to whom Putzmeister America sold equipment, and Putzmeister America has refused to provide the information needed for Pompaction to evaluate those sales.

57.     Pompaction reasonably believes Putzmeister America sold repair and replacement parts to Customers A, B, and F because the equipment Putzmeister America sold would have required repair and replacement parts over time, and Pompaction did not receive any orders for parts from those customers related to the equipment Putzmeister America sold within Pompaction's territory.

58.     Pompaction does not know, and has no way of knowing, all of the customers within Pompaction's territory to whom Putzmeister America sold repair and replacement parts, and Putzmeister America has refused to provide the information needed for Pompaction to evaluate those sales.

59.     On multiple occasions, Pompaction continued to raise the issue of Putzmeister America's encroaching sales in communications with Putzmeister America representatives, including in a letter to Putzmeister America's then-CEO on June 27, 2019.

60.     In July 2019, in apparent retaliation for Pompaction's complaints about Putzmeister America's encroachment on its territory, Putzmeister terminated the PMA Agreement.

61.     The termination was purportedly with immediate effect, with the intent to deprive Pompaction of the opportunity to communicate the change to its customers in an appropriate manner, and the termination resulted in the cancellation of orders.

62.     After the termination, Pompaction requested that the orders it had placed prior to the purported effective date of the agreement be honored. PMA allowed only one or two of the previously placed orders to continue, and cancelled the rest of the pending orders.

63.     In October 2019, Putzmeister America sent a letter to Pompaction's competitor ("Competitor A") informing it that Pompaction could no longer sell certain pieces of equipment and inviting Competitor A to attempt to complete those sales instead.

64.     One of the orders Putzmeister America cancelled was for Pompaction's loyal customer ("Customer G"), who had placed an order for a Putzmeister VSP 70 truck-mounted pump prior to termination of the agreement.

65.     The VSP 70 order from Customer G had been placed with Pompaction in February 2019, and Pompaction promptly placed the order with Putzmeister America, who acknowledged and confirmed the order. Putzmeister America knew Pompaction had taken this order and intended to fill the order.

66.     Nonetheless, in October 2019, shortly before the VSP 70 order was expected by Customer G, Putzmeister America sent a communication to Customer G telling Customer G that it would be impossible for Pompaction to proceed with delivery of the VSP 70.

67.     As a result of that communication, Customer G cancelled its order with Pompaction.

68.     Upon information and belief, Putzmeister America sold the VSP 70 directly or through Competitor A or another of Pompaction's competitors to Customer G, at a lower price, depriving Pompaction of profit from the sale.

12

69.     Like with Customer G, another customer ("Customer H") had placed an order with Pompaction (who in turn placed the order with Putzmeister America) for a BSF 47-18H, a larger Putzmeister machine, before Putzmeister America terminated the PMA Agreement.

70.     Pompaction requested that it be allowed to fulfill the order and complete the transaction, but Putzmeister America refused, and Customer H cancelled its order. Upon information and belief, Putzmeister America sold the BSF 47-18H directly or through Competitor A or another of Pompaction's competitors to Customer H, at a lower price, depriving Pompaction of profit from the sale.

71.     Upon information and belief, Putzmeister America sold parts and equipment to other customers above and beyond the customers listed herein, either directly or through an authorized dealer, in Pompaction's territory.

72.     In January 2020, Pompaction met with representatives of Putzmeister Holding and Putzmeister Germany to discuss the future of Pompaction's role with Putzmeister. Minutes from the meeting were distributed to Putzmeister America's then-CEO, as well.

73.     Putzmeister Holding instructed Pompaction and Putzmeister America to "de-escalate" the situation in order to allow for a smoother relationship between Pompaction and the Putzmeister entities for Pompaction's continued sale of industrial and underground equipment.

74.     At this meeting, Putzmeister Holding and Putzmeister Germany again reiterated Pompaction's valuable role in customer relationships and its technical expertise, and suggested "further elaboration of a potential solution" that "has to be checked and discussed together with the PMA colleagues."

**F. Putzmeister Promises that Pompaction Will Be Allowed to Continue as Industrial Distributor.**

75.     On March 31, 2020, Putzmeister provided a letter to Pompaction stating that Putzmeister was not renewing the PIT Agreement.

76.     The letter provided notice that the termination would be effective one year later— on March 31, 2021.

77.     Pompaction promptly contacted his contacts at Putzmeister Holding and Putzmeister Germany to figure out what was going on.

78.     The "Head of Global Sales Back Office Industrial Technology," who upon information and belief acted on behalf of both Putzmeister Holding and Putzmeister Germany, informed Pompaction that Putzmeister intended to keep Pompaction on as the dealer for Putzmeister industrial products in the United States and Canada, they were just going to run the contract through Putzmeister America instead. Putzmeister Holding and Putzmeister Germany instructed Pompaction to work with Putzmeister America to set up the newly reconfigured distributorship for industrial equipment and parts.

79.     In effect, Putzmeister Holding and Putzmeister Germany represented that they were not actually terminating the relationship with Pompaction, but rather, they were simply making an administrative change for marketing and business purposes. Putzmeister Holding and Putzmeister Germany informed Pompaction that it could enter into a substantially similar agreement and would continue as an exclusive Putzmeister dealer of industrial equipment and parts with rights over its existing territories.

14

80.     Following these instructions, Pompaction promptly began working with Putzmeister America to set up the replacement distributorship agreement for Putzmeister industrial equipment and parts.

81.     Putzmeister America confirmed that it would be taking over as the Putzmeister entity with whom Pompaction should contract for industrial equipment and parts.

82.     Putzmeister America promised Pompaction it would continue as a distributor of Putzmeister industrial products, assuring Pompaction that the parties would enter into an agreement under which Pompaction would continue to distribute industrial equipment and parts and would continue to service customers in Pompaction's assigned territory.

83.     Consistent with those promises, Pompaction continued business as usual, and throughout the year, continued working on memorializing the contractual arrangement with Putzmeister America to continue on as a distributor, as instructed by Putzmeister Holding and Putzmeister Germany.

84.     Over the full year from March 2020 to March 2021, Putzmeister America continued to string Pompaction along by pretending to negotiate a new distributor agreement. Putzmeister America routinely delayed its responses and repeatedly suggested that an oral agreement was reached that only needed to be memorialized in writing.

85.     In September 2020, the parties reached general agreement on the terms of a three-year, renewable agreement for Pompaction to continue its distribution of Putzmeister industrial equipment and parts.

86.     In early October, the parties clarified and refined the terms and reached an agreement in principle. On October 3, 2020, the parties exchanged emails on one of the final details (the contract term length), and the CEO of Putzmeister America, who was handling the

15

discussions on behalf of Putzmeister, said he was considering "how to present this to Germany" and that he was "confident [he] can get agreement [from Germany]." On October 5, 2020, the Putzmeister America CEO said, "I am looking forward to Pompaction being the PIT & PUC partner. With PMA now being the regional leader responsible for growing these businesses, I truly want to put these past issues behind us and quickly move toward evaluating business plans and how together we can turn our focus to our customers."

87.     A couple of days later, in a follow-up email, Putzmeister America also represented it would "immediately begin the [sic] formalizing" the terms they had agreed upon.

88.     After the October 2020 agreement in principle, rather than downsize (as Pompaction would have done if its distributorship were coming to a close), Pompaction instead hired more staff to be prepared to continue services beyond March 2021.

89.     The parties continued fine-tuning some of the details, but the substance of the agreement in principle remained unchanged in the weeks that followed. In early February 2021, Putzmeister America finally sent a written contract that encompassed the terms the parties had discussed and agreed upon. The contract reflected that it was intended by the parties to "memorializ[e] their agreement." Putzmeister America agreed it would clean up and finalize the document for the parties to sign.

90.     The agreement identified PSP as a third-party beneficiary to the contract. On information and belief, this was intended to be a reference to PCP, as it was written after PSP merged into PCP.

91.     Pompaction did not propose any further revisions after that point, and was simply waiting for Putzmeister America to send the final, clean version for signature.

92.     A few weeks passed without Putzmeister America following through on providing the signature copy of the agreement. On March 18, 2021, Pompaction's president wrote to Putzmeister America to inquire about when he would receive the document for signature, and stated as follows: "Our contract discussions were concluded and were expected to be finalized after being written up by your lawyers over 6 weeks ago. Since, Pompaction has been moving ahead as if the agreements were in place."

93.     In response, just a few days away from the time the replacement contract was expected to go into effect—concurrent with the anticipated conclusion of the PIT Agreement on March 31, 2021, that followed the one-year notice period—Putzmeister America blindsided Pompaction and claimed there had never been an agreement, informed Pompaction that Putzmeister had decided to go in another direction, and filed suit against Pompaction.

94.     Pursuant to discussions to try to resolve the dispute, Putzmeister America agreed to extend the PIT Agreement to May 31, 2021—and to do so, Putzmeister America presented Pompaction with an extension contract to be signed by Pompaction and PCP.

95.     Upon information and belief, Putzmeister's position is that the PIT Agreement is terminated as of May 31, 2021, and no further distributorship agreement exists or will exist.

96.     The Putzmeister entities are poised to step into and take over a developed market for Putzmeister pumps and related equipment and parts. Putzmeister would receive a ready-made market for Putzmeister products that was built by Pompaction.

97.     Putzmeister America acknowledged this benefit it seeks to wrongfully convert, and has expressed its intention to hire Pompaction's staff after Pompaction is forced to let them go.

17

98.    Had Pompaction been told it would no longer be a distributor of Putzmeister products, Pompaction would have used the one-year period from March 31, 2020, to March 31, 2021, to smoothly transition out of the industry, alert its customers to the change, and inform them about how to obtain warranty service after the end of the relationship, and would not have hired additional employees in fall 2020 to be prepared to take on the business from continuing as a Putzmeister distributor.

99.    Instead, Pompaction relied on the promises and representations of Putzmeister that Pompaction would continue as a distributor of Putzmeister industrial products and carried on its business, continuing to promote the Putzmeister brand and secure orders. As a result, Pompaction was denied the opportunity to smoothly transition out of the industry.

**G. Putzmeister America Continues to Undermine Pompaction.**

100.    Putzmeister America has also allowed another distributor to sell industrial products within Pompaction's territory, undermining the exclusive rights of Pompaction to distribute industrial products in its territory under the PIT Agreement between Pompaction and Putzmeister Germany.

101.    In September 2020, Putzmeister America allowed Competitor A, a distributor of certain concrete pumps and similar equipment and a competitor of Pompaction, to offer for sale parts for industrial equipment to an important Pompaction mining customer ("Customer I"). Customer I is located in Quebec, which is in Pompaction's exclusive territory for Putzmeister's industrial equipment and parts.

102.    Competitor A quoted these parts to Customer I at a significantly lower price than Pompaction could offer for the same parts from Putzmeister Germany.

18

103.     The parts were unmistakably for industrial equipment (for which Pompaction was the only authorized distributor in Canada) and not for concrete pumps and similar equipment (for which Competitor A has been an authorized distributor since Putzmeister America terminated the agreement with Pompaction).

104.     Pompaction only learned about this order approximately six months later, soon before they were to be delivered, and was able to stop the fulfillment of that particular wrongful order. However, Customer I expressed displeasure at the higher prices that Pompaction had to charge and threatened to pursue Pompaction for damages caused by delay in delivery.

105.     Upon information and belief, Putzmeister America has sold industrial parts and equipment to other customers, through Competitor A, in Pompaction's territory.

## COUNT I
## Breach of Contract (PMA Agreement)

106.     Pompaction hereby incorporates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

107.     The PMA Agreement was a valid and enforceable contract between Pompaction and Putzmeister America.

108.     Under Section 2.2.1 of the PMA Agreement, Pompaction had exclusive rights to distribute the specified Putzmeister equipment, as well as parts, within its assigned territory, as "the only distributor of the Products appointed by Putzmeister for the Territory."

109.     Pompaction's assigned territory under the PMA Agreement was Quebec and the Atlantic Provinces of New Brunswick, Nova Scotia, Prince Edward Island, Newfoundland, and Labrador.

19

110. Despite Pompaction's contractual rights to sell exclusively within its assigned territory, Putzmeister America sold equipment to several known customers within Pompaction's territory.

111. Upon information and belief, Putzmeister America sold parts to these same customers, and Pompaction reasonably suspects it sold equipment and parts to more customers that Pompaction does not, and cannot, know about because the information is only in Putzmeister America's possession, custody, and control, and Putzmeister America did not compensate Pompaction for these sales.

112. Putzmeister America's sales into Pompaction's territory breached the PMA Agreement.

113. As a result, Pompaction suffered damages in an amount to be determined at trial.

## COUNT II
### Anticipatory Breach of Contract (Replacement Industrial Distributorship Agreement)

114. Pompaction hereby incorporates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

115. Pompaction on the one hand, and Putzmeister America on the other hand, had a meeting of the minds and reached an agreement on the terms for a distributorship agreement to replace the PIT Agreement.

116. The parties' agreement was valid and binding, and resulted in a four-year distributorship agreement that granted Pompaction the right to sell Putzmeister industrial parts and equipment in an exclusive territory.

117. Despite reaching an agreement, Putzmeister America has clearly indicated it does not believe any agreement exists and does not intend to comply with the agreement, and

Pompaction anticipates Putzmeister America will not abide by the agreed terms of the replacement distributorship agreement and will not sell products to Pompaction.

118.     As a result, Pompaction suffered damages in an amount to be determined at trial.

**COUNT III**
**Promissory Estoppel**

119.     Pompaction hereby incorporates and realleges the allegations contained in the paragraphs above as though fully set forth herein.

120.     Pompaction brings this claim in the alternative, in the event the Court does not find the parties reached an agreement on the terms of a replacement distributorship agreement for industrial equipment and parts.

121.     Putzmeister America repeatedly promised that Pompaction would continue as a Putzmeister distributor of industrial equipment and parts.

122.     The parties reached agreement on the terms for such a distributorship agreement that simply needed to be memorialized in writing, and Putzmeister America's agreement to those terms constituted promises, including that Pompaction would be allowed to continue distributing Putzmeister industrial products in its assigned territory after the PIT Agreement ended.

123.     Putzmeister America reasonably should have expected its promises would induce Pompaction to act in reliance on these promises.

124.     Pompaction reasonably relied on the promises by hiring additional staff, continuing to promote the Putzmeister brand in its territory, and refraining from taking steps to wind down the Putzmeister portion of its business and transition into new business.

125.     Injustice can only be avoided by enforcing Putzmeister America's promises.

**COUNT IV**
**Injury to Business, Wis. Stat. § 134.01 – DISMISSED WITHOUT PREJUDICE**

**COUNT V**
**Quantum Meruit/Unjust Enrichment - DISMISSED WITHOUT PREJUDICE**

**COUNT VI**
**Fraudulent Inducement - DISMISSED WITHOUT PREJUDICE**

WHEREFORE, Pompaction respectfully requests judgment as follows:

A.  An award of Pompaction's actual and compensatory damages in an amount to be determined at trial;

B.  An award of punitive damages in an amount to be determined at trial;

C.  Awards of all available statutory costs, pre- and post-judgment interest, and attorneys' fees;

D.  Disgorgement of any profits received by Putzmeister America related to their conduct as described in this pleading;

E.  Specific performance of the replacement distributorship agreement for industrial equipment and parts;

F.  Declaratory, injunctive, and equitable relief; and

G.  Such other relief as the Court deems just and equitable.

**Pompaction hereby demands a trial by jury of all claims so triable.**

22

Dated this 11th day of March 2022.

**O' NEIL CANNON HOLLMAN
DEJONG & LAING, S.C.**

*Attorneys for Defendant Pompaction Inc.*

By:  *s/ Christa D. Wittenberg*

Joseph D. Newbold, SBN 1085294
Joe.Newbold@wilaw.com
Christa Wittenberg, SBN: 1096703
Christa.Wittenberg@wilaw.com
111 E. Wisconsin Ave., Ste. 1400
Milwaukee, Wisconsin 53202